24 A.3d 722

**Maurice CARTER**

v.

**HUNTINGTON TITLE & ESCROW, LLC.**

**No. 116, Sept. Term, 2010.**

Court of Appeals of Maryland.

July 14, 2011.

606

Philip S. Friedman (Friedman Law Offices, PLLC, Washington, D.C.; Richard S. Gordon and Benjamin H. Carney of Quinn, Gordon & Wolf, Chtd., Baltimore, MD), on brief, for appellant.

Neil J. Dilloff (Jodie E. Buchman of DLA Piper LLP (US), Baltimore, MD; Lloyd D. Lurie of Law Offices of Lloyd D. Lurie, Baltimore, MD), on brief, for appellee.

Jessica Weber, Esq., Francis D. Murnaghan, Appellate Advocacy Fellow, Public Justice Center, Baltimore, MD, Jean Constantine–Davis, Esq., AARP Foundation Litigation, Michael Schuster, Esq., AARP, Washington, D.C., for Amici Curiae brief of Public Justice Center, Maryland Consumer Rights Coalition and AARP.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

This appeal from a judgment of the Circuit Court for Baltimore City beckons us to consider whether the Maryland Insurance Administration ("MIA") is invested with primary

jurisdiction over claims of title insurance overcharging alleged by Appellant, Maurice Carter ("Carter"), against Appellee, Huntington Title & Escrow, LLC ("Huntington"), such that Carter must pursue his claim initially in an administrative, rather than judicial, forum. As one part of the requirements of refinancing his home loan, Carter purchased lender's coverage title insurance from Huntington, an issuing agent for Stewart Title Guaranty Company ("Stewart"). On behalf of a putative class of similarly situated persons, Carter alleged in his complaint filed in the Circuit Court for Baltimore City that he was entitled to a reduced policy "reissue rate," as mandated by the MIA, rather than the original issue rate charged actually. The original issue rate charged, according to Carter, was forty percent higher, in violation of the Maryland Insurance Article. As explained *infra*, we conclude that the MIA possesses primary jurisdiction over Carter's claim, and, consequently, Carter must seek relief initially through the administrative adjudication process.

## I.

### A. *Factual Background*

Our recitation of the facts derives from the allegations of Carter's complaint because the Circuit Court granted Huntington's motion to dismiss. In the Winter of 1998, Carter purchased a house in Baltimore City. Generally, at closing, a home buyer pays for two title insurance policies, one with coverage for the owner and the other protecting the lender. The complaint suggests that Carter purchased only an owner's policy at that time.

Ten years later, Carter decided to take advantage of lower interest rates and refinanced his home loan. He purchased a lender's policy only on this occasion. Stewart's "Schedule" or "Manual" of Charges, provided:

3. Reissue Charge for Mortgagee[, *i.e.*, Lender] Policies
When the owner of property on which application is made for mortgagee title insurance has had the title to the property insured as owner, within the prior ten (10) years,

the owner shall be entitled to the ... reissue charge on the mortgage insurance, up to the face amount of the owner's policy[.]

*       *       *

If the amount of insurance desired under the mortgagee policy is in excess of the original owner's policy, the excess shall be computed at the applicable original charge.

A mortgagee policy cannot be issued for an amount less than the full principal debt. A policy can, however, be issued for an amount up to 20% in excess of the principal debt to cover interest, foreclosure costs, etc.[1]

In light of the seeming simplicity of this provision, Carter averred in his complaint that Huntington applied to his refinance closing the more costly original issue rate for the lender's policy and "simply pocketed its ... percentage [as agent] of the difference."[2] He averred that such behavior violated Maryland Code (1997, 2006 Repl.Vol., 2010 Supp.), Insurance Article ("Ins. Art."), § 27 (otherwise known as the Unfair Trade Practices Title),[3] and, concordantly, gave rise to a common law claim for "money had and received."[4] Carter

---

1. This reissue rate, in Carter's words:

   [R]eflects the simple fact that when only a few years have passed since the issuance of a title insurance policy, there is reduced risk of title defects or other problems that may cause claims against the new title insurance policy, and also less work involved in examining the title for defects.

2. Carter states that the reissue rate would have saved him about $165 on the cost of the lender's title insurance policy.

3. All citations are to the Insurance Article. Moreover, because this alleged cause of action accrued in 2008, we refer to the current version of the statute (unless otherwise indicated), as the General Assembly has not amended substantively, in the interim, the pertinent provisions.

4. In particular, Carter asserts that Huntington violated Maryland Code (1997, 2006 Repl.Vol., 2010 Supp.), Insurance Article ("Ins. Art."), § 27–216(b)(1)(i), which states that: "A person may not willfully collect a premium or charge for insurance that ... exceeds ... the premium or charge applicable to that insurance under the applicable classifications and rates as filed with and approved by the Commissioner...." Carter believes the appropriate mechanism to allege such a violation is

asserted also a claim for "negligent misrepresentation," as Huntington knew the rate charged was incorrect, but nevertheless made an "affirmative misrepresentation [at closing on a Housing and Urban Development form known as HUD–1] that the rate charged was the proper rate."

## B. *Carter's Claims*

In support of his money had and received/statutory violation claim, Carter stresses that, pursuant to Md.Code (1995, 2003 Repl.Vol., 2010 Supp.), Ins. Art., § 11–403(a)(1)(2), title insurers must file with the MIA "all rates or premiums, supplementary rate information, forms of contracts, policies, or guarantees of insurance, and all modifications of contracts, policies, or guarantees of insurance that it proposes to use." *See also* § 22–101 ("Premiums for title insurance shall be set out clearly and subject to the approval of the Commissioner [of the MIA].").  Further, title insurers must "hold to" and "not deviate from" those "rates or premiums," once approved. § 11–407(b).  Indeed, a title insurer "may not make or issue a contract, policy, or guarantee of insurance except in accordance with filing approved" by the Commissioner. § 11–407(a).[5]  Drawing on other provisions in the Insurance Article, the MIA established the "Best Price Rule," which states that "[a]n individual insurer ... must always place a consumer in

---

a claim for "money had and received," which "lies whenever the defendant has obtained possession of money which, in equity and good conscience, he ought not to be allowed to retain." *Benson v. State*, 389 Md. 615, 652–53, 887 A.2d 525, 547 (2005) (internal quotation marks and citations omitted).

**5.** At oral argument, Carter posited that these statutory provisions "necessarily become part and parcel of the insurance contract itself."  In *Dennis v. Mayor & City Council of Rockville*, 286 Md. 184, 189–90, 406 A.2d 284, 287 (1979), we reiterated that "the laws subsisting at the time of the making of a contract enter into and form a part thereof as if expressly referred to or incorporated in its terms, and the principle embraces alike those provisions which affect the validity, construction, discharge and enforcement of the contract." (Citations omitted.)  It is unclear, however, what document(s) Carter believed comprised the "contract."

the most favorably priced (least expensive) ... tier for which the consumer qualifies." [6]

Carter alleged that Huntington violated its "duty to charge no more and no less than [its] filed rates for title insurance." As asserted more specifically in his complaint:

46. [Huntington] assessed and collected premiums for title insurance in amounts exceeding the rates that the principal of Huntington ... [ (*i.e.*, Stewart) ] had filed with the [MIA].

47. By doing so, [Huntington] violated Maryland Insurance [Article] § 27–216 and has come into the possession of money in the form of premium payments for title insurance that it had, and has[,] no right to at law or in equity.

48. It would be inequitable for [Huntington] to retain any such monies that it had no legal right to charge and [Carter] seeks to recover that portion of the excessive premium that [Huntington] retained for itself in its contract with Stewart.

In sum, then, Carter avers that Maryland statutes and regulations required Huntington to receive approval of rate schedules, not to deviate from those rates once approved, and to award customers the best possible price for which they qualify. *See* § 11–403(a)(1)–(2); *see also* § 11–407(a). By imposing the original, rather than reissue, rate in Carter's case, Huntington exposed itself to a money had and received/statutory violation claim.

---

**6.** The MIA's General Guidelines provide an exception to the Rule, which is not relevant for our purposes. The exception states that:

[I]nsurers that utilize different distribution systems are permitted to exclude consumers from eligibility within those ... tiers that represent distribution systems for which the consumer does not qualify. However, the consumer must always be given the Best Price within the distribution system for which they qualify. Examples of different distribution systems would include: affinity groups vs. general public or direct writers vs. independent agents.

## C.  *Procedural Background*

On 8 December 2009, Huntington filed in the Circuit Court a motion to dismiss.  Without responding substantively to the factual allegations of the complaint (save for describing Carter's putative class action as part of a "[l]itigation campaign"), Huntington argued that the General Assembly's statutory scheme invested the MIA with primary jurisdiction over Carter's claim.  Carter, as the argument went, was required to seek redress initially through the administrative adjudication process, as opposed to proceeding directly in a court of law.  In addition, Huntington asserted that Carter's negligent misrepresentation claim did not allege falsity and, accordingly, failed to state a claim upon which relief can be granted.

Carter opposed Huntington's motion to dismiss, contending that his money had and received claim existed at common law and, as such, may be brought directly in a circuit court.  With respect to the negligent misrepresentation claim, Carter retorted that Huntington knew the rate charged was incorrect, but nevertheless made an "affirmative misrepresentation [on the HUD–1 form] that the rate charged was the proper rate." According to Carter, Huntington's defense to the negligent misrepresentation count amounts to saying that, "so long as [a title insurer] lies with a straight face, it cannot be held liable under a claim of negligent misrepresentation."

The Circuit Court granted, by written order, Huntington's motion to dismiss.  Carter appealed to the Court of Special Appeals.  Before the intermediate appellate court could decide the appeal, we issued a writ of certiorari, *Carter v. Huntington Title & Escrow, LLC*, 417 Md. 384, 10 A.3d 199 (2010), to consider the following questions framed in Carter's brief:

(1) [W]hether the M[aryland] Insurance [Article] requires an exhaustion [7] of administrative remedies before pursuing

---

7.  "Primary jurisdiction" and "exhaustion" are not identical administrative law concepts.  As we iterated in *Arroyo v. Board of Education of Howard County*, 381 Md. 646, 658, 851 A.2d 576, 583–84 (2004):

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views."

(Citation omitted) (quoting *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126, 132 (1956)); *see also* KRAMER & MARTIN, THE LAW OF POOLING AND UNITIZATION § 25.04 (3d ed. 1997) ("[P]rimary jurisdiction concerns whether a court should defer action on a matter on which it has jurisdiction pending input from an administrative agency that may assist the court in resolving the matter properly before it; exhaustion, on the other hand, deals with whether review may be had at all of agency action that is not the last agency word on the matter." (footnote omitted)).

The doctrine of primary jurisdiction arises when two non-agency parties are involved in a court action, both the court and the agency have jurisdiction over that action, and "the argument is made that although the court does have jurisdiction ... so does the agency, and the agency should be given the right to hear it first." ARNOLD ROCHVARG, MARYLAND ADMINISTRATIVE LAW 120 (2d ed.2007). By agreeing that the agency should hear the case first, the court is saying effectively that it will stay its hand and send otherwise justiciable claims to the agency. Then, "[o]nce the administrative process runs its course," the court "may ... entertain the pending judicial action (with or without any subsequently filed action for judicial review), giving due weight and deference to the administrative agency's decision in its area of particular expertise." *Converge Servs. Group, LLC v. Curran*, 383 Md. 462, 485, 860 A.2d 871, 884 (2004) (citation omitted).

We refer often to this initial commitment to the agency as the exhaustion of administrative remedies. *See e.g., Bd. of Educ. for Dorchester County v. Hubbard*, 305 Md. 774, 786, 506 A.2d 625, 631 (1986) ("Where ... the administrative remedy is deemed to be primary, this Court has generally held that it must be pursued and *exhausted* before a court exercises jurisdiction to decide the controversy." (internal quotation marks and citations omitted)); *Maryland–National Capital Park and Planning Comm'n v. Crawford*, 307 Md. 1, 18, 511 A.2d 1079, 1087–88 (1986) ("[W]here the administrative agency may have primary jurisdiction ... the trial court may retain jurisdiction pending exhaustion of administrative procedures." (citations omitted)). Nonetheless, the rule of exhaustion of administrative remedies pertains more accurately to a claimant challenging an *agency action;* such challenges do not enjoy necessarily an immediate right to judicial intervention. *See Arroyo*, 381 Md. at 658, 851 A.2d at 583–84 (" 'Exhaustion applies where a claim is cognizable in the first instance by an administrative

a claim for money had & received to recover title insurance premiums charged by title insurers that are in excess of the premium rates approved by the [MIA] Commissioner?

(2) [W]hether a claim for money had & received to recover title insurance premiums charged by title insurers that were in excess of the premium rates approved by the [MIA] Commissioner is a cause of action [ ]dependent of the [I]nsurance [Article]?

(3) [W]hether a false statement of the amount chargeable for title insurance on a HUD–1 settlement statement is an affirmative misrepresentation which can support a claim for negligent misrepresentation under M[aryland] Law?

---

agency alone.' " (quoting *Western Pacific R.R. Co.*, 352 U.S. at 63, 77 S.Ct. at 165, 1 L.Ed.2d at 132) (internal quotation marks omitted)); *Smith v. County Comm'rs of Kent County*, 418 Md. 692, 712 n. 20, 18 A.3d 16 (2011) ("It may be said fairly that when a litigant fails to exhaust his or her administrative remedies, he or she seeks judicial review of an *agency action* that is not 'final.' " (citations omitted)); *Woodford v. Ngo*, 548 U.S. 81, 89, 126 S.Ct. 2378, 2385, 165 L.Ed.2d 368, 377 (2006) ("Exhaustion gives an agency an opportunity to correct *its own mistakes* with respect to the programs it administers before it is haled into federal court . . . ." (emphasis added) (internal quotation marks and citations omitted)); *Woodford*, 548 U.S. at 90, 126 S.Ct. at 2385–86, 165 L.Ed.2d at 378 ("This Court has described the [exhaustion] doctrine as . . . follows: [a]s a general rule . . . courts should not topple over *administrative decisions* unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice." (emphasis added) (internal quotations marks and citations omitted)); *Darby v. Cisneros*, 509 U.S. 137, 152, 113 S.Ct. 2539, 2547, 125 L.Ed.2d 113, 126–27 (1993) ("Congress intended . . . to ensure that the judicial doctrine of exhaustion of administrative remedies would continue to apply . . . to permit federal courts to refuse to review *agency actions* . . . ." (emphasis added) (citation omitted)); THE LAW OF POOLING AND UNITIZATION § 25.04 ("[E]xhaustion . . . deals with whether review may be had at all of *agency action* that is not the last agency word on the matter." (emphasis added) (footnote omitted)). In such a case, courts will decline to exercise judicial *review* until the party seeking review exhausts his/her/ its administrative remedies. Imprecisions notwithstanding, most often there is "no real need to distinguish [between the two concepts] where the proper resolution is to require the matter to be addressed by the agency." THE LAW OF POOLING AND UNITIZATION § 25.04 (footnote omitted). Thus, while we confront the issue of primary jurisdiction here, we still cite and quote nonetheless from sources which did not parse the differences.

## II.

### A. *Money Had and Received/Statutory Violation*

#### 1. *Huntington's Elaborated Argument*

Huntington avers that the relevant statutory scheme install-ed by the General Assembly bestowed the MIA with primary jurisdiction over Carter's "money had and received"/statutory violation claim. In *Zappone v. Liberty Life Insurance Co.,* 349 Md. 45, 706 A.2d 1060 (1998), we held that, where the Legislature provides "[ (1) ] an administrative and judicial review remedy ... and [ (2) ] a possible alternative judicial remedy" for a "particular matter or matters," we must deter-mine whether it intended the agency to have exclusive, pri-mary, or concurrent jurisdiction. *Zappone,* 349 Md. at 60, 706 A.2d at 1067.

> [T]he administrative remedy may be exclusive, thus pre-cluding any resort to an alternative remedy. Under this scenario, there simply is no alternative cause of action for matters covered by the statutory administrative remedy.
>
> \* \* \*
>
> [T]he administrative remedy may be primary but not exclusive. In this situation, a claimant must invoke and exhaust the administrative remedy, and seek judicial review of an adverse administrative decision, before a court can properly adjudicate the merits of the alternative judicial remedy.
>
> \* \* \*
>
> [T]he administrative remedy and the alternative judicial remedy may be fully concurrent, with neither remedy being primary, and the plaintiff at his or her option may pursue the judicial remedy without the necessity of invoking and exhausting the administrative remedy.

*Zappone,* 349 Md. at 60–61, 706 A.2d at 1067–68 (emphasis, internal quotation marks, and citations omitted).

"[I]n the absence of specific statutory language indi-cating otherwise," there is a "rebuttable presumption that ...

an administrative remedy was intended to be primary." *Bell Atlantic of Md., Inc. v. Intercom Sys. Corp.*, 366 Md. 1, 12, 782 A.2d 791, 797 (2001). In deciding whether this presumption prevails in a particular context, we weigh at least four germane factors, including: "the comprehensiveness of the administrative remedy," the "agency's view of its own jurisdiction," the claim's "depeden[ce] upon the statutory scheme which also contains the administrative remedy," and the claim's "dependen[ce]" upon the agency's expertise. *Zappone*, 349 Md. at 64–66, 706 A.2d at 1070.

Huntington asserts that "[a]ll of the[se] . . . factors are met in this case." The Insurance Article prescribes a comprehensive administrative remedy, or so Huntington concludes— §§ 4–113(b), (d)(1), and (d)(2) "authoriz[e] the suspension of the certificate of authority, [the] imposi[tion of] penalties and [the] requir[ement of] restitution to any person who has suffered financial injury as a result of any violation[ ]." Moreover, the MIA views its jurisdiction as concurrent *only* where "the plaintiff has a common law claim" purely, which is not the case here. Huntington argues also that Carter's cause of action is "wholly dependent on . . . the Maryland Insurance [Article]," a fact made explicit by Carter's repeated invocations of the Article in his complaint. But for the insurance statute, Huntington asseverates, "Carter's claim would not exist."

Lastly, Huntington declares that the proper analysis of the merits of Carter's cause of action would benefit from the application of the MIA's expertise. Huntington posits that such expertise "is important" in deciding "whether there was a statutory violation[,]" "whether Carter is correctly interpreting the rate structure that was filed with the MIA[,]" "whether there was any [willful] intent to commit a statutory violation," as per § 27–216, and what should be "the proper remedy if there was a statutory violation." At oral argument, we questioned whether the agency's expertise was an important factor in parsing Carter's claim because the Stewart Manual of Charges outlines straightforwardly, or so it seems, the criteria that dictate (1) whether a consumer qualifies for

the reissue rate, and (2) consequently, whether Huntington violated the statute by charging the higher original rate. Huntington cautioned us at oral argument as follows:

> [Huntington]: There are numerous factors, starting with the language itself in the statute, that expertise [must] be applied to, [that] determine whether someone gets the discount rate. It is not automatic. It is not just a situation where if you had an original title insurance policy and you refinance in ten years, [you] automatically get the discount rate. . . .

> [The Court]: Can you show us the filing [with the Insurance Commissioner] where it makes it clear that it's not automatic. . . .

> [Huntington]: Well, the language of the statute ... talks about willfullness number one. That goes to intent. . . .

> [The Court]: Well, we're really not concerned with willfullness in a money had and received claim.

> [Huntington]: Well, let me continue. . . . There [are] multiple situations ... where one would not get the discount rate depending on intervening events.

> [The Court]: What I'm asking you is while you're arguing, it's nice if we could have before us what your basis is for saying that it's not cut and dry because it sure seems cut and dry. . . .

> [Huntington]: Well. . . . The good news is we won on a motion to dismiss. The bad news is there was no discovery, no record in this case that I could invite your Honor's attention to that has that data in it. For example, if someone where deposed in the case, they would say ... that if a husband and wife get married and they have a title insurance policy and they get divorced later on within five years and a new wife gets on the policy, that does not mean you get the automatic rate because the risk has changed.

> \* \* \*

> [The Court]: But all that stuff is set up when you file your rates, is it not?

[Huntington]: No. There is a Manual [of Charges], part of which is in the record, which talks about the various factors about whether you qualify. If one starts with the statute, it says if you qualify for this reduced rate, then you get it. The word "qualification" is a matter that is within the ken of the Maryland Insurance Administration because whether you qualify or not depends on whether there was a change in title during the ten years.

\* \* \*

[Huntington]: [Y]ou have to have people that are identical owners, policy number one, and then ten years later, the same persons.

In support of all of its contentions, Huntington relies heavily upon the reasoning of the federal Fourth Circuit Court of Appeals's opinion in *Arthur v. Ticor Title Insurance Co. of Florida,* 569 F.3d 154 (4th Cir.2009). Considering nearly identical alleged facts and legal issues as those in the present case, the *Arthur* Court determined that a consumer's money had and received/statutory violation claim: (1) could access the "same remed[ies] before the [Maryland Insurance] Commissioner that they seek [in federal court]," (2) "explicitly depends on the statute that also [contains] administrative remedies," and (3) "implicates the expertise of the Maryland Insurance Commissioner...." *Arthur,* 569 F.3d at 161–62. Huntington concludes, therefore, that Carter is obliged to engage first the agency adjudicatory apparatus.

### 2. *Carter's Elaborated Remonstrance*

Carter takes umbrage with *Arthur's* "misapplication of Maryland law, as well as its deleterious effect on thousands of Maryland consumers harmed by title insurance overcharges." In his estimation, the exclusive/primary/concurrent jurisdiction paradigm is inapplicable because the Legislature gave the MIA no jurisdiction whatsoever over a claim such as his, however characterized. Carter argues that the Insurance Article authorizes the Commissioner, but not an aggrieved consumer, to file such a complaint against a title insurer. *See* Brief of Appellant at 22 (stating that "Huntington pre-

sum[es]," but "never explain[s] how" a person "who believes an insurer has charged an excessive title insurance premium can file a complaint with the Insurance Commissioner"); *see* Brief of Appellant at 22 n. 7 (stating that the Commissioner may hold a hearing only where "the complainant has been aggrieved by an action of the Commissioner," not where, like here, the complainant "has been aggrieved by an action of [a title insurer]").

Arguing presumably in the alternative, Carter suggests that even if the Legislature granted the MIA administrative jurisdiction, it specified clearly in the statute that such jurisdiction is concurrent. To support his contention, Carter points to § 27–103(e) [8] and our interpretations of that section. Brief of Appellant at 14 ("The [Insurance Article] is quite specific in granting consumers, like Mr. Carter, the right to judicially pursue the recovery of excessive premium charges."); *See* Brief of Appellant at 13 (quoting *Mardirossian v. Paul Revere Life Ins. Co.*, 376 Md. 640, 645, 831 A.2d 60, 64 (2003), for the proposition that "the administrative remedy under §§ 27–103 through 27–105 is neither exclusive nor primary"). Thus, Carter considers an analysis of the *Zappone* factors unnecessary. *See Zappone*, 349 Md. at 62, 706 A.2d at 1068 ("[S]ometimes the Legislature will set forth its intent as to whether an administrative remedy is to be exclusive, or primary, or simply a fully concurrent option. . . .").

Then, presupposing that the Legislature was less than clear in the statute with regard to its jurisdictional assignment, Carter concludes that analysis of the *Zappone* factors bends in his favor and the presumption of primary jurisdiction is rebutted. Carter posits that, generally, the MIA is capable of providing only "limited," as opposed to comprehensive, relief.[9]

---

8. Section 27–103(e) provides that "[a] cease and desist order issued under this section . . . does not relieve any person affected by the order from any other liability . . . under law."

9. An aggrieved consumer who proceeds through the MIA process may access, Carter seems to suggest, only the non-monetary penalty provisions of §§ 27–103 through 27–104, which include cease and desist

In this particular case, the remedies available to the MIA are especially meager—Carter is "not alleging some isolated instance of a mere overpayment," but a "practice of intentional and widespread deception . . . for which [a] mere[ ] . . . refund . . . is clearly *not an adequate remedy* for the consumer harms alleged." (Emphasis added.)

Carter emphasizes also that the MIA, on at least one other occasion, viewed its jurisdiction as concurrent in analogous circumstances. In its amicus brief filed in *Zappone*, the MIA argued that "[w]here the conduct of a licensee is both prohibited by the Insurance [Article] and . . . [the] common law . . . , the Insurance Commissioner and the courts have concurrent jurisdiction to hear the claim." Brief for Maryland Insurance Administration, as Amicus Curiae Supporting Appellants, *Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 706 A.2d 1060 (1998) (No. 133), at 10. Carter presupposes, without more, that the factual differences between *Zappone* and this case present no obstacle to the continuing persuasiveness of the MIA's amicus brief.[10]

Carters avers additionally that his causes of action stand separate and apart from the Insurance Article, "even [though his] claim seeks to recover money paid in violation of a statute." Brief of Appellant at 17 (quoting *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 632 n. 11 805 A.2d 1061, 1077 n. 11 (2002) for the proposition that "an action to recover excess interest, even when the applicable legal interest rate is set by statute, is a common law action"). Lastly, Carter argues that "[t]he enforcement of established rates requires no expertise of the Commissioner."

orders, and injunction and restraining orders, respectively. Reply Brief of Appellant at 9 n. 3 ("Under [Huntington's] reading of the statute, it is not even clear how an individual claimant could possibly avail himself of Title 4's [broader] penalty provisions, as opposed to the administrative procedures for violations of unfair and deceptive insurance practices set forth under Title 27.")

10. The MIA did not seek permission to file an amicus brief in Carter's appeal.

The rate is the rate. It has already been reviewed and approved by the Commissioner. Mr. Carter has no grievance with the Commissioner or with the rate itself, a fact which constitutes a necessary predicate to even request [an administrative] ... hearing. But most assuredly, there is no expertise required of the Commissioner to confirm that Mr. Carter was charged a premium in excess of the approved rate any more than there would be for the Motor Vehicle Administration to confirm that a motorist exceeded the posted speed limit.

### B. *The Negligent Misrepresentation Claim*

For reasons to be explained *infra*, we need not dwell on the parties' arguments concerning the negligent misrepresentation claim. Suffice it to say that Huntington insists Carter failed to state a claim upon which relief can be granted because he did not plead the knowing falsity of the relevant statements on the HUD–1 form. In Carter's eyes, it was enough that Huntington knew or should have known that he qualified for the reduced rate, but charged the higher rate nevertheless.

### III.

### A. *Is Analysis of the* Zappone *Factors Necessary in this Case?*

■ Before evaluating precisely what level of administrative jurisdiction the Legislature intended to grant the MIA over money had and received/statutory violation claims like Carter's, we address Carter's arguments that (1) the Legislature did not vest any jurisdiction in the MIA over his claim or (2) in the alternative, it indicated clearly that the MIA has concurrent jurisdiction. We conclude that Carter's arguments are unsustainable.

In enacting the Insurance Article, the Legislature accorded aggrieved consumers, like Carter, an administrative remedy for being charged allegedly excessive insurance premiums. We grant that the *Commissioner* may file, on his/her initiative, a complaint against a title insurer. *See* § 2–201(a) (stat-

ing that, to enforce this article, "[t]he Commissioner may bring an action in a court of competent jurisdiction ... or an order issued by the Commissioner under this article"). Nonetheless, also a consumer may file such a complaint with the Commissioner, who then proceeds on the consumer's behalf. *See* § 2–108 ("[T]he Commissioner ... has the powers and authority ... reasonably implied from this article; shall enforce this article ... and ... may conduct examinations and investigations of insurance matters as necessary to fulfill the purposes of this article."); Brief of Appellant at 22 (stating that § 2–108 "indicat[es] that a person 'may' file a complaint with the Commissioner"); § 2–109(a)(1) ("The Commissioner may adopt regulations to ... carry out this article...."); COMAR § 31.02.01.02(B)(2) (2007) (" 'Administrative complaint' means a document that ... [i]s received by the Commissioner from any person ... and ... alleges a violation of ... a law or regulation enforced by the Commissioner...."); COMAR § 31.02.01.02(B)(4)(b) (" 'Determination' includes ... [a] decision as to whether a person against whom an administrative complaint has been *received* violated a law, regulation, or order.") (emphasis added).

Indeed, the nondescript language of the statute suggests that consumers and insurers alike may request hearings. *See* § 2–210(a)(2) ("The Commissioner shall hold a hearing ... on written demand by a person aggrieved by any act of, threatened act of, or failure to act by the Commissioner...."); *Muhl v. Magan*, 313 Md. 462, 467, 545 A.2d 1321, 1323–24 (1988).[11] In any event, if the insurer requested the hearing,

---

**11.** The regulatory scheme for the MIA was recodified in 1998. Before the recodification, the scheme provided a mechanism for a preliminary hearing, prior to any formal hearing. The preliminary hearing provisions were derived from Md.Code (1957, 1986 Repl.Vol.), Art. 48A, § 35, the precursor to Md.Code (1995, 2003 Repl.Vol., 2010 Supp.), Ins. Art., § 2–210.

The 1998 recodification repealed the preliminary hearing system, but much of the regulatory language, regarding how to request a hearing, was relocated elsewhere. In interpreting the now-repealed, but substantially similar language in the MIA regulations, we observed that it provided aggrieved consumers with a means of requesting a hearing.

the aggrieved consumer is not required to, but is allowed to intervene and, thereafter, become a party. *See* § 2-213(c) ("The Commissioner shall allow any person ... to become a party by intervention if ... the financial interests of the person will be directly and immediately affected by an order of the Commissioner resulting from the hearing."); *see also* COMAR § 31.02.01.07(C)(2) (same).

We conclude that the Insurance Article imbues the MIA with jurisdiction over claims like Carter's, which allege a violation of § 27-216. Moreover, we do not agree (as Carter asserts in the alternative) that the Article limns clearly this jurisdictional grant as "concurrent."

Carter suggests that, taken together, *Zappone* and *Mardirossian* settle the matter. In *Zappone*, we considered whether the General Assembly intended that a consumer, with common law claims for fraud and negligent misrepresentation, must seek relief first through the administrative regulatory apparatus. *See Zappone*, 349 Md. at 50, 706 A.2d at 1062-63. As part of our analysis, we examined the language of the Unfair Trade Practices Title and concluded that the "General Assembly has clearly stated that the administrative remedy is not exclusive." *Zappone*, 349 Md. at 68, 706 A.2d at 1071. Moreover, we recognized that "[w]hile there are no applicable provisions in [Title 27]" stating as much, the statutory language "does suggest that the administrative remedy is not to be primary." *Id.* The primary statutory language upon which we relied in expressing this view appeared in one of the penalty provisions of the Insurance Article (Art. 48A, § 215(d), now § 27-103(e)) and read that "[n]o order of the Commissioner pursuant to this section ... shall in any way relieve or absolve any person affected by such order from any other liability, penalty, or forfeiture under law." Based on the "any

*See Muhl v. Magan,* 313 Md. 462, 467, 545 A.2d 1321, 1323-24 (1988) ("A person who complains that another has violated the Insurance [Article] and who desires a hearing on that complaint m[ay] request [a] hearing within thirty days of 'having been notified of the Commissioner's action, intention to act, or failure to act' " (citing COMAR § 09.30.67.04B (1986))).

way relieve" language, we concluded that "the General Assembly did not intend, *under circumstances like those in* [*Zappone* ], to preclude claimants from pursuing a *recognized independent tort remedy* without first invoking and exhausting the administrative remedy under [Title 27]." *Id.* (emphasis added). We held, in other words, that the Legislature installed in the agency concurrent jurisdiction over wrongs like those inflicted upon Ricardo Zappone, which violated the common law and the statute.

Five years later, in *Mardirossian,* we were presented with a certified question from the U.S. District Court for the District of Maryland:

Does Maryland law provide a judicial cause of action, entirely independent of the Maryland Insurance [Article], for a claim to compel specific performance on an oral contract for disability insurance?

After a relatively succinct analysis, we held that (1) "oral contracts to provide insurance policies are enforceable," (2) through a "common law [claim] . . . of specific performance," and (3) the Insurance Article did not "modify[ ]" or "supplant Maryland common law contract enforceability principles." *Mardirossian,* 376 Md. at 649, 831 A.2d at 64–65. Again, we found persuasive § 27–103(e), which states that "[a] cease and desist order issued under this section . . . does not relieve any person affected by the order from any other liability . . . under law." *Id.*

Proceeding to reflect upon an uncertified and unasked question, we volunteered that:

While not specifically asked in the certified question, we also agree with the [aggrieved consumer] . . . that the administrative remedy under §§ 27–103 through 27–105 is neither exclusive nor primary. The Maryland *common law contract remedy* is fully concurrent, and may be pursued in court without exhausting the administrative remedy under §§ 27–103 through 27–105.

*Mardirossian,* 376 Md. at 649, 831 A.2d at 65 (emphasis added) (citation omitted). Thus, we implied in dicta that the

Legislature granted the agency concurrent jurisdiction over wrongs like those inflicted upon Aris Mardirossian, which sounded in the common law and the statute.

The language of *Zappone* and *Mardirossian* stands in critical distinction to the present case. In *Zappone* and *Mardirossian*, the behavior of the defendants violated the Insurance Article. Nevertheless, the consumers possessed a "recognized independent tort remedy" and a "common law contract remedy," respectively, and, therefore, could seek relief outside of the administrative regulatory scheme. Taken together with the language in the statute, regarding "in any way relieve" and, later, "does not relieve," we were able to conclude that the Legislature did not intend the Insurance Article to subsume or swallow the entirely independent causes of action stated in *Zappone* and *Mardirossian.*

The Legislature did not express the same intent with respect to claims, like those in the present case, alleging, as we see it, purely statutory violations. Indeed, if anything, we find indicia suggesting that the Legislature evinced a preference for primary jurisdiction as to such claims. For example, many of the relevant penalty provisions of the Insurance Article begin with the phrase "[i]f the Commissioner finds" or "[i]f the Commissioner believes," implying that the MIA, not the courts, should take the first cut at such claims. Moreover, the statute intimates that some remedies, such as the revocation of a license to sell insurance, may be imposed only by the Commissioner and, thus, are limited to the administrative forum. *See* § 4–113 ("The Commissioner shall ... revoke a certificate of authority if. . . ."). In any event, it is enough for present purposes that sufficient uncertainty exists to justify a *Zappone* analysis in Carter's case. *See Zappone*, 349 Md. at 62, 706 A.2d at 1068 ("While sometimes the Legislature will set forth its intent as to whether an administrative remedy is to be exclusive, or primary, or simply a fully concurrent option, most often statutes fail to specify the category in which an administrative remedy falls. Consequently various principles[, *i.e.*, factors] have been applied by this Court to resolve the matter.").

## B. *Enter the* Zappone *Factors*

### 1. *The Comprehensiveness of the Administrative Adjudication Remedy*

The Insurance Article is composed of nearly thirty diverse titles, ranging from "Health Insurance" to the "Slavery Era Insurance Policy Reporting." There are a vast amount of provisions, spread over multiple titles, that apply just to title insurers, like Huntington. No doubt the General Assembly created a comprehensive, if not complex, regulatory and remedial scheme (though, some may find the word "labyrinthine" a fairer description). *See Zappone*, 349 Md. at 64, 706 A.2d at 1070 ("A very comprehensive administrative remedial scheme is some indication that the Legislature intended the administrative remedy to be primary. . . ."). The question, however, is whether that scheme is sufficiently comprehensive, such that the Legislature displayed an intent for claims, like Carter's (which allege violation of Title 27) to proceed first through the MIA.

In *Zappone,* we discussed the "regulatory and remedial provisions of [Title 27]." *Zappone*, 349 Md. at 67, 706 A.2d at 1071. Although we described them as "somewhat comprehensive," we found that they were not so "all-encompassing" as to "preclude resort to a *fully* independent common law remedy. . . ." *Id.* (emphasis added). As explained above, we saw § 27–103(e) as an escape valve for some claimants, who, under an all-inclusive and comprehensive statutory scheme, otherwise may have to forsake or abate their common law claims and pursue relief through the statute.

Thus, in *Zappone,* we considered whether the comprehensiveness of the administrative remedy forced a consumer with a "recognized independent tort remedy" into an administrative adjudication, via application of the doctrine of primary jurisdiction. *See Zappone,* 349 Md. at 50, 706 A.2d at 1062–63. In the present case, however, the question is quite distinct— whether the comprehensiveness of the statute allows a consumer, with a claimed statutory violation, to pursue directly a judicial remedy in a court of law merely by characterizing or

recasting the regulatory violation as a common law claim. As elucidated further *infra*, we find that the Legislature evinced an intent—in the sophistication of the framework of prohibited acts and remedial salves that is the Insurance Article (and in the other *Zappone* factors)—that claims dependent on the Article, in that they allege and depend on a statutory benchmark violation, should be considered first by the administering agency. Thus, while the Insurance Article may suggest that the administrative remedy is merely concurrent for truly and fully independent common law claims, it suggests a primary jurisdictional grant for claims alleging what amounts to purely statutory violations.

The "does not relieve" language in § 27–103(e) does not compel a different conclusion. In the current context, it puts violators on notice that he/she/it may be responsible for additional sanctions, despite the receipt of a cease and desist order. By implication, it recognizes also that there may be proceedings leading up to those additional sanctions. It does not resolve, however, whether the proceedings, in the first instance, should be administrative or judicial in nature, depending on the nature of the claim as explicated in a complaint.[12]

## 2. *The Agency's View of Its Jurisdiction*

Carter impresses upon us that the MIA construed in *Zappone* its legislative grant of jurisdiction as concurrent. Reviewing the MIA's *Zappone* amicus brief, however, we found no instance where the MIA addressed the controversy before this Court. As noted above, the issue in *Zappone* was whether the Commissioner and the court have concurrent jurisdiction to hear a claim, arising out of conduct which is "both

---

12. The General Assembly (and its legislative drafts-people) seems to understand how to indicate clearly where it is intended that the MIA have only concurrent jurisdiction. In § 2–202, which concerns discrimination in underwriting and rate-setting, the Legislature specified that "the Human Relations Commission has concurrent jurisdiction with the Commissioner over alleged discrimination on the basis of race, creed, color, or national origin." The General Assembly did not make such a statement as regards § 27–216–based claims.

prohibited by the Insurance [Article] and ... [the] common law...." Brief for Maryland Insurance Administration, *Zappone*, at 10.

More illuminating is a relatively recent amicus brief (brought to our attention by Huntington) where the MIA addressed whether an individual must "first exhaust available administrative remedies before seeking injunctive relief in court," for a claim "arising solely from Maryland's comprehensive statutory scheme for the regulation of insurance...." Brief for Maryland Insurance Administration, as Amicus Curiae Supporting Appellee, *Med. Protective Co. v. Bottiglieri*, No. 1826 (Md.App. Jan. 14, 2008), at 1. The MIA concluded that "[w]hen an administrative process is available to a litigant for the violation of a statutory obligation, that process must be pursued and exhausted before judicial relief may be sought." Brief for Maryland Insurance Administration, *Bottiglieri*, at 15. The agency quoted from *Muhl*, 313 Md. at 480–81, 545 A.2d at 1330:

> Where the General Assembly has provided a special form of remedy and has established a statutory procedure before an administrative agency for a special kind of case, a litigant must ordinarily pursue that form of remedy and not bypass the administrative official. So strong is this public policy that this Court will, *sua sponte*, vacate judgment and order an action dismissed where the litigants have not followed the special statutory procedure.

(Citations omitted.)

Once we explain, in greater detail *infra*, why we find that Carter alleges in his complaint a "violation of a statutory obligation," as opposed to a truly and fully independent common law claim, we will be able to say fairly that, for such violations, the General Assembly "has provided a special form of remedy...." Therefore, the longstanding and commonsensical principle of first pursuing "that form of remedy" should be applied in this case.

### 3. *The Claim's Dependence Upon the Statutory Scheme*

We consider next the dependence of Carter's claims, as framed by him, upon the Insurance Article. Although Carter says that he is pursuing simply his common law right to retrieve money that was paid improperly, he justifies the basis for recovery by alleging a violation of a statute. The causes of action in *Zappone* and *Mardirossian* were treated as common law in nature because they existed without an essential underpinning found in the Insurance Article. *See Zappone* (stating that "the Insurance [Article violation] was not the only recognizable cause of action"; "[i]nstead ... the plaintiff[ ] set forth recognized common law causes of action sounding in deceit and negligence"); *Mardirossian,* 376 Md. at 648, 831 A.2d at 65 (establishing, as a necessary predicate in the analysis, that an oral contract to provide insurance was "enforceable by specific performance under Maryland *common law* ")(emphasis added). In its substantive entirety, Carter's complaint alleged that:

49. As set forth above, [Huntington] assessed and collected premiums for title insurance in amounts exceeding the rates that the principal of Huntington ... [ (*i.e.,* Stewart) ] had filed with the [MIA].

47. By doing so, [Huntington] violated Maryland Insurance [Article] § 27–216 and has come into the possession of money in the form of premium payments for title insurance that it had, and has[,] no right to at law or in equity.

48. It would be inequitable for [Huntington] to retain any such monies that it had no legal right to charge and [Carter] seeks to recover that portion of the excessive premium that [Huntington] retained for itself in its contract with Stewart.

49. As a consequence, [Carter] and the members of the [c]lass have been damaged.

In its purest form, Carter's cause of action alleges a statutory violation, not a fully independent common law claim. Nonetheless, Carter avers that his cause of action is indepen-

dent of the statute, based on a legal fiction recognized in *Dua*
(2002), *Williar v. Baltimore Butchers' Loan & Annuity Ass'n*,
45 Md. 546 (1877), and *Scott v. Leary*, 34 Md. 389 (1871). In
*Dua*, we stated, in a footnote, that:

> Our cases have made it clear that an action to recover
> excess interest, *even when the applicable legal interest rate
> is set by statute*, is a common law action. *Williar* [45 Md. at
> 559] ("[A] suit . . . to recover money which had been paid by
> the plaintiff upon a usurious contract, in excess of the legal
> rate of interest . . . . was not conferred by the Code, . . . but
> existed at common law"); *Scott* [34 Md. at 394] ("It is
> undeniable that at common law a party who has paid
> excessive interest may recover it back in an action for
> money had and received[.]").
>
> In addition, the proper legal rate of interest [in the
> present case] was not set by statute but was set by Article
> III, § 57, of the Maryland Constitution[, which states that
> "[t]he Legal Rate of Interest shall be Six per cent per
> annum, unless otherwise provided by the General Assem-
> bly."]. In Maryland, an action to enforce state constitutional
> rights is a recognized common law cause of action. *Wid-
> geon v. Eastern Shore Hosp. [Ctr.]*, 300 Md. 520, 479 A.2d
> 921 (1984).

370 Md. at 632 n. 11, 805 A.2d at 1077 n. 11 (emphasis added).
Read in context, it is evident that the *Dua* footnote is dicta.
At the time, we were responding to the suggestion that a
certain cause of action was statutory and, therefore, unpro-
tected by the Maryland Constitution as a vested right. We
dispatched this argument with a clear statement that a vested
rights analysis "applies to both common law and statutory
causes of action." *Dua*, 370 Md. at 632, 805 A.2d at 1077. We
then addressed in the footnote, and superfluously at that,
whether the plaintiff's cause of action was statutory actually.

There are multiple reasons why this footnote's persuasive
value, for present purposes, is doubtful. First, the cases cited
there, *Williar* and *Leary*, concerned statutory rates of interest
for purposes of commercial law, not premiums and jurisdic-
tional issues in the context of insurance law, like the present

case. Second, *Williar* and *Leary* both involved a six percent interest rate that was set by statute *and* Article III, § 57 of the Maryland Constitution. Thus, our conclusion that a claim to recover excess statutory interest existed at common law was unnecessary. Finally, in *Dua*, we did not hang our hat actually on the hundred-year-old opinions in *Williar* and *Leary*. Rather, we underscored that the proper legal rate of interest, in fact, was established by the Maryland Constitution, and an independent action to enforce a constitutional right was recognized at common law. *Dua*, 370 Md. at 632 n. 11, 805 A.2d at 1077 n. 11.

Aside from these cases, there is little support for the general, unnuanced proposition that allegations based solely on a statutory violation are separate, distinct, and fully independent of the assertedly violated statute. More consistent over time has been our oft-repeated sentiment that, for certain kinds of wrongs, the Legislature established a statutory procedure and remedy, through which claimants "ordinarily must seek to redress the wrong ...." *Agrarian, Inc. v. Zoning Inspector of Harford County*, 262 Md. 329, 332, 277 A.2d 591, 592 (1971). Such is the case here.

Carter points to our overruling in *Zappone* of *Vicente v. Prudential Insurance Co. of America*, 105 Md.App. 13, 658 A.2d 1106 (1995), to support his position that claims reliant upon a statute may co-exist independently at common law. In *Vicente*, the agent of a health insurer told a potential customer that the health-insurer principal "was licensed to sell insurance in Maryland and ... met [certain statutory] capitalization requirements...." *Zappone*, 349 Md. at 57, 706 A.2d at 1066. After realizing that these were not accurate representations, the customer sued the health insurer agent for fraud and negligent misrepresentation. *See Vicente*, 105 Md.App. at 15, 658 A.2d at 1107. The Court of Special Appeals held that the customer had to proceed initially through the MIA. *See id.*

After conducting our analysis in *Zappone* and articulating the distinction among exclusive, primary, and concurrent jurisdiction, we stated, without further discussion, that "the above-

summarized principles . . . . [make] it . . . clear that the Court of Special Appeals erred in *Vicente* . . ., and that case is overruled." *Zappone*, 349 Md. at 66, 706 A.2d at 1070–71. By overruling *Vicente*, we did not mean to suggest that claims based on the violation of a statute somehow may thrive outside the statute in all instances. Indeed, in *Vicente*, the customer was concerned not that the Insurance Article required the health insurer to be licensed and capitalized, but that the agent lied to the customer about these details. The Insurance Article, in other words, was not the grounding of the customer's grievances.

The same cannot be said in the present case. Carter does not allege that Huntington promised (in either an oral or written contract) to charge a specified amount, but failed to do so. Rather, he complains, clearly and solely, that Huntington charged a rate in excess of the MIA-approved schedule, irrespective of whether that schedule became part of some unspecified oral or written contract. This is a statutory, not contractual, claim. *See Arthur*, 569 F.3d at 161 ("[P]laintiffs have suggested no reason other than a violation of the Insurance [Article] that [the insurer] would be liable to them under a claim for money had and received.")

### 4. *The Claim's Dependence Upon the Expertise of the Agency*

Lastly, we face conflicting arguments over the dependence of a merits analysis of Carter's claim upon the exercise of the MIA's expertise. Carter argues that the Manual of Charges describes a simple test for whether a homeowner qualifies for the mortgagee reissue charge—the homeowner must have "had the title to the property insured as owner, within the prior ten (10) years. . . ." Huntington cautions, however, that there is more to the analysis than meets the eye.

At oral argument, Huntington claimed that the statute plays some part in this calculus, arguing "[i]f one starts with the statute, it says if you qualify for this reduced rate, then you get it. The word 'qualification' is a matter within the ken of the [MIA]. . . ." After a thorough review of the Insurance

Article, we found no support for this averment. In hopes of illuminating its point, Huntington described a hypothetical example, where a couple is divorced five years after purchasing title insurance, and the husband remarries five years later and decides to refinance with his new spouse. According to Huntington, the husband and new mate may not qualify automatically for the reissue rate.

We look somewhat wryly at Huntington's unsupported, but strenuously-made avouchments. Nonetheless, standing in the lengthy shadow of the multi-volume Insurance Article, we are reluctant to say confidently that, in practice, unique situations will not arise, requiring agency expertise to help determine whether a homeowner/borrower qualifies for the reissue rate. Moreover, we appreciate that agency expertise could play a role in other areas—most notably, in deciding whether "[a] person [or insurer] ... *willfully* collect[ed] a premium or charge for insurance" in violation of § 27–216(b).[13] In addition, presumably, the General Assembly would not have begun many of the penalty provisions with the phrase "[i]f the Commissioner finds" unless it intended the Commissioner to exercise his or her institutional expertise in fashioning an appropriate remedy in certain cases—one which not only makes the consumer whole, but also advances the cause of insurance regulation in this State.

Lending further support to the notion that the Legislature wanted the Commissioner to exercise his or her expertise in such cases is the fact that many of the remedies under the statute are unavailable traditionally in law or equity. Indeed, while the Insurance Article authorizes the Commissioner to revoke a license to sell insurance, for example, there is no evidence that such a remedy would exist in a court of this State. The General Assembly appears to have enacted the Insurance Article not only to create such remedies (which were necessary assumedly for a healthy insurance environ-

---

13. By making findings of fact, the Commissioner could serve a valuable prefatory fact-finding and analytical purpose sounding in judicial economy.

ment), but also to place their judicious allotment in the hands of the Commissioner. *Converge Servs. Group, LLC v. Curran*, 383 Md. 462, 485, 860 A.2d 871, 884 (2004) ("There is little doubt that a reviewing court would be in a better position to render global and appropriate relief in this dispute were it to have the benefit of the Division's final view on the panoply of claims.").

In these circumstances, *i.e., for this type of statutory violation claim*, the *Zappone* factors augur for the primary jurisdiction presumption. Indeed, they reveal an affirmative legislative grant to the MIA of such jurisdiction in such cases.

### C. *Inadequate Remedy*

Carter alleges also that, even if the MIA possesses primary jurisdiction, he should not be compelled to proceed through the administrative apparatus because the relief afforded in the Insurance Article is inadequate for any consumer, but especially him. We disagree. First, the fact that an administrative remedy may be inadequate is considered usually an exception to *exhaustion*, but not necessarily *primary jurisdiction*. *See supra* note 7. Moreover, were we to consider the exception argued by Carter to the doctrine of primary jurisdiction, we would remain obstinate in light of the present facts. As we made clear in *Zappone*, there were (and are) an assortment of remedies available in the Insurance Article.

The general administrative remedy for violations of the Unfair Trade Practices [T]itle is contained in § 215 [now § 27–103]. That section provides for charges of unfair trade practices to be made to the Insurance Commissioner, notices of hearings, intervention by interested persons, hearings before the Commissioner, the Commissioner's issuance of cease and desist orders, and judicial review of the cease and desist orders. Section 216 [now § 27–104] provides for an administrative hearing remedy with respect to practices not defined as unfair practices in the subtitle but determined by the Commissioner to be unfair trade practices. That section provides for injunctions if the unfair practice continues after a final administrative determination.

Other sections of the Unfair Trade Practices [T]itle contain specific remedial provisions for violations of the particular section involved. *See, e.g.,* § 230A [now § 27–305] (Commissioner can order monetary penalties and restitution if the section is violated); § 233 [now § 27–408] (criminal penalties); § 234AA(g) [now § 27–502(g) ] (fine imposed by the Commissioner); § 234C [now § 27–505] (Commissioner may order an insurer to accept a particular risk).

Moreover, Art. 48A, §§ 35–40 [now §§ 2–210 through 2–215], provide an administrative and judicial review remedy generally to enforce [all] provisions and purposes of the Insurance [Article, including the Unfair Trade Practices Title]. Furthermore, Art. 48A, § 55 [now §§ 4–113 through 4–114], authorizes the Insurance Commissioner to revoke or suspend an insurer's license if the insurer "violates any provision of this article" or "knowingly fails to comply with any lawful rule, regulation or order of the Commissioner," and § 55A [now § 4–113(d) ] authorizes monetary penalties and restitution in lieu of or in addition to revocation or suspension.

*Zappone,* 349 Md. at 51–52, 706 A.2d at 1063–64; *see also* COMAR § 31.02.01.11(B) ("[T]he hearing officer may order relief as appropriate under the relevant provisions of . . . [the] Insurance Article. . . ."). Even where a statute did not provide monetary relief, we declined to extend an "inadequate remedy" exception, due to the beneficial exercise of the expertise of the agency. *Heery Int'l, Inc. v. Montgomery County,* 384 Md. 129, 862 A.2d 976 (2004). In the present case, the range of accessible remedies make it even more unlikely that we would apply the exception. *See Heery Int'l, Inc.,* 384 Md. at 150, 862 A.2d at 989 ("Th[e inadequate remedy] exception to the administrative exhaustion requirement . . . will be recognized only under the most equitable of circumstances as the exception works against the sound policy favoring completion of available administrative processes and prevention of disruption of those processes.").

Nonetheless, Carter emphasizes his status as a putative class action plaintiff, alleging that, without direct access to the

courts, "many thousands of [overcharged] consumers" will have to "individually spend months or years ...[,] at the expense of thousands of taxpayer dollars[,] pursuing administrative remedies before the [MIA] and subsequent judicial appeals to, at most, recover only the amount of overpayment...." The parties present no information regarding the authorization or practical ability of the MIA to accommodate a putative class of similarly situated consumers. We are unaware of any provision in the Insurance Article prohibiting expressly as much. Moreover, we consider the administrative ramifications of malfeasant behavior, on the part of insurers, worthy of some trepidation. *See* COMAR 31.02.04.02 ("In determining the amount of the financial penalty to be imposed, the Commissioner shall consider the ... violator's history of previous violations...."). Should changes be needed, we trust that the Legislature will make them.[14, 15]

## IV. Stay or Go?

■ Lastly, we consider whether the Circuit Court should relinquish jurisdiction by dismissing Carter's complaint or stay this case pending the outcome of any administrative proceeding. In *Arroyo v. Board of Education of Howard County*, 381 Md. 646, 650 n. 5, 851 A.2d 576, 579 n. 5 (2004), we reviewed a series of cases *involving primary jurisdiction* and indicated ultimately that "the primary jurisdiction of an

---

14. The parties disagree over whether "established principles of agency law also bar [Carter's] claim." We did not issue a writ of certiorari to address this question and express no opinion on the matter.

15. We hold that the MIA should consider initially Carter's claim. Our decision is based, at least in part, on the fact that the agency is better equipped to decide, in the first instance, whether Carter qualified for the reissue rate—a predicate of his claim. The same may be said for the negligent misrepresentation count, which alleges that Huntington "[mis]represent[ed] and/or omi[tted] and conceal[ed]" information about "the terms and pricing of title insurance," thereby inducing Carter "to purchase title insurance at rates ... prohibited under the law of Maryland." Whether Huntington charged actually a legally-prohibited rate depends on whether Carter, in fact, qualified for the lower reissue rate. As a result of our disposition, we need not address the parties' disagreement about the element of "falsity."

agency ... does not actually prohibit the filing of an independent judicial action, only its adjudication prior to the exhaustion of the administration remedy." *See also Converge Servs. Group*, 383 Md. at 480, 860 A.2d at 881 ("[T]he court may stay its consideration of the invoked judicial remedy and await the result of the administrative proceedings before addressing the appropriateness of the relief sought in the litigation." (citations omitted)); *Maryland–National Capital Park & Planning Comm'n v. Crawford*, 307 Md. 1, 18, 511 A.2d 1079, 1087–88 (1986) ("[I]n situations like that in the present case ... where the administrative agency may have primary jurisdiction, and where the plaintiff invokes the judicial remedy prior to exhausting the administrative procedures, it has been held that the trial court may retain jurisdiction pending exhaustion of the administrative procedures." (citations omitted)). Therefore, we conclude that, although Carter did not file an administrative complaint, he was not foreclosed from filing the present judicial action, only that he could not pursue it to a conclusion at this time. The Circuit Court should stay further proceedings regarding the judicial complaint until the outcome of the administrative adjudication. If Carter neglects to pursue administrative relief within a reasonable time, then his judicial claim may not progress and, in all likelihood, would be dismissed. *See* Maryland Rule 2–507 (authorizing dismissal for lack of prosecution).

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED WITH INSTRUCTIONS TO STAY FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT.**

BELL, C.J., and ADKINS, J., Dissent.

ADKINS, J., dissenting, in which BELL, C.J., joins.

When a plaintiff seeking a remedy under the Insurance Code also asserts a cause of action in negligent misrepresentation, the administrative remedy is *concurrent with* the judicial remedy. *See Zappone v. Liberty Life Ins. Co.*, 349 Md. 45,

66–68, 706 A.2d 1060, 1071 (1998). Here, Carter successfully alleged negligent misrepresentation, and thus, under *Zappone*, he is not required to first pursue administrative remedies. Because the majority ignores the *Zappone* rule, and effectively forecloses a judicial remedy that is an equal or more efficient forum for resolution of Carter's claim, I most respectfully dissent.

## I.

Judge Eldridge, writing for the *Zappone* court, clearly articulated when the Insurance Commissioner's jurisdiction over a cause of action was primary, and when it was concurrent. *See Zappone*, 349 Md. 45, 706 A.2d 1060 (1998). There, a plaintiff brought suit in circuit court, alleging violation of the Unfair Trade Practices subtitle of the Insurance Code, as well as acts of fraud, negligent misrepresentation, and negligence. *Id.* at 50, 706 A.2d at 1062. The circuit court dismissed, believing the administrative remedies to be primary. *Id.* at 56–67, 706 A.2d at 1066. The circuit court relied on *Vicente v. Prudential Ins. Co. of America*, 105 Md.App. 13, 658 A.2d 1106 (1995), in which the Court of Special Appeals similarly held that the Insurance Commissioner had primary jurisdiction over a lawsuit involving similar claims, i.e., violations of the Insurance Code, fraud, and negligent misrepresentation.

The *Zappone* Court carefully detailed the standards of primary and concurrent administrative remedies, concluding that a remedy was concurrent to a judicial, common-law remedy when "[1] the alternative judicial remedy is entirely independent of the statutory scheme containing the administrative remedy, and [2] the expertise of the administrative agency is not particularly relevant to the judicial cause of action[.]" *Zappone*, 349 Md. at 65–66, 706 A.2d at 1070. This Court then applied these standards to the subject lawsuit, which was a combination of Insurance Code and common-law negligence actions, including negligent misrepresentation, and concluded that, with regard to those common-law tort claims, the Insurance Code remedies were not primary. *Id.* at 66–67,

706 A.2d at 1070–71.[1]  Notably, the Court had no problem concluding that agency expertise was "irrelevant," even while observing that resolution of the common-law torts at issue might require application of various provisions of the Insurance Code. *See id.* at 51, 706 A.2d at 1063.[2]

The status of the law after *Zappone* is clear:  a plaintiff bringing common-law claims sounding in fraud, deceit, or negligence is not required to exhaust administrative remedies in the Insurance Code before seeking judicial remedies.  Indeed, the majority embraces the *Zappone* rule and its applicability to cases involving negligent misrepresentation.  *See* Maj. Op. at 626, 24 A.3d at 734 (because *Zappone* plaintiffs "possessed a 'recognized independent tort remedy' " sounding in fraud and negligent misrepresentation, they "could seek relief outside of the administrative regulatory scheme.").  The majority, however, then makes a volte-face by embracing *Zap-*

---

1.  The *Zappone* Court stated:

> The plaintiffs' asserted causes of action in deceit and negligence are wholly independent of the Insurance Code's Unfair Trade Practices subtitle.  No interpretations or applications of the Insurance Code or of any regulations by the Insurance Commissioner are involved.  Instead, under the plaintiff's allegations and theory of the case, their right to recover money damages is totally dependent upon the common law tort principles applicable to deceit and negligence actions.  Moreover, the expertise of the Insurance Commissioner would appear to be irrelevant to these common law causes of action.

*Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 67, 706 A.2d 1060, 1071 (1998).

2.  The *Zappone* Court recognized that the "pertinent provisions" of the Insurance Code included, but were not limited to, the following provisions:

> 48A, § 217, prohibits any person from, inter alia, making or causing to be made any "statement misrepresenting ... the benefits or advantages" because of any insurance policy.  Section 218, inter alia, prohibits a statement or representation with respect to the conduct of insurance business "which is untrue, deceptive or misleading."  Section 233(d)(1) makes it a "fraudulent insurance act" for a person to make, knowingly or willfully, "any false or fraudulent statement or representation ... with reference to any application for insurance."  Section 216 authorizes the Insurance Commissioner to define unfair practices in the business of insurance in addition to those unfair practices defined in the subtitle.

*Zappone*, 349 Md. at 51, 706 A.2d at 1063.

*pone,* but then deciding not to follow it. *Compare* Maj. Op. at 626, 24 A.3d at 734 (In *Zappone,* "we were able to conclude that the Legislature did not intend the Insurance Article to subsume or swallow the entirely independent causes of action") *with* Maj. Op. at 637, 24 A.3d at 741 n. 15 (holding that the Insurance Article subsumes Carter's claim of negligent misrepresentation).

The majority's puzzling reversal in course is explained in its final footnote. After applying the *Zappone* factors to Carter's other cause of action, a "money had and received claim," and concluding that the Insurance Commissioner has primary jurisdiction over that statutory claim, the majority extends that holding to Carter's negligent misrepresentation allegations as well:

> We hold that the MIA should consider initially Carter's claim [regarding the "money had and received" claim]. Our decision is based, at least in part, on the fact that the agency is better equipped to decide, in the first instance, whether Carter qualified for the reissue rate—a predicate of his claim. The same may be said for the negligent misrepresentation count, which alleges that Huntington "[mis]represent[ed] and/or omi[tted] and conceal[ed]" information about "the terms and pricing of title insurance," thereby inducing Carter "to purchase title insurance at rates . . . prohibited under the law of Maryland." Whether Huntington charged actually a legally-prohibited rate depends on whether Carter, in fact, qualified for the lower reissue rate.

Maj. Op. at 637, 24 A.3d at 741 n. 15. Although the discussion is brief, it seems that the majority believes the negligent misrepresentation claim should be heard by the Insurance Commissioner because it fails one of the two so-called *Zappone* factors, i.e., because the agency is "better equipped" to decide whether Carter qualified for the reissue rate.

Yet, in another part of its opinion, the majority seemingly rejects Huntington's claim that the Insurance Code provisions addressing who qualifies for the reissue rate for title insurance was a complicated matter needing expertise, declaring that "[a]fter a thorough review of the Insurance Article, we found

no support for this averment." Maj. Op. at 634, 24 A.3d at 738–39. The majority goes on to describe Huntington's claim that the issue requires agency expertise as an "unsupported, but strenuosly-made avouchment[.]" Maj. Op. at 634, 24 A.3d at 739. Indeed, the title company's "Manual of Charges," clearly states that an owner who "has had the title to the property insured as owner, within the prior ten (10) years, ... will be entitled to the ... reissue charge," which is 40% less. At oral argument, moreover, members of the Court pressed Huntington's counsel to explain where the complications arise, and he came up with only one example, i.e., when there was a divorce and remarriage. This hypothetical did not impress the majority as a situation requiring agency expertise, and it impresses me even less.

Accordingly, I cannot see why the majority capitulated to Huntington's "agency expertise" argument on the off-chance that sometime, somewhere, a "unique" situation will arise "requiring agency expertise to help determine whether a homeowner/borrower qualifies for the reissue rate" Maj. Op. at 634, 24 A.3d at 739. Unlike the majority, I am unwilling to deny Carter access to the court out of the fear that some unnamed, unique situation might arise and befuddle a trial court judge, especially when the criteria for determining qualification for a reissue rate, i.e., whether a property owner has bought title insurance within the last ten years, is so simple. Moreover, uncertainty and complexity are the stock and trade of trial court judges, and the determination of whether a property owner who seeks to refinance has bought owner's title insurance for his property within the last ten years is, when compared to other determinations a circuit court must make, a relative "piece of cake." If an unusual, complex situation arises, which is highly unlikely, the parties could provide expert testimony, as is routinely done in trial courts.

There also seems to be a trend emerging across the nation favoring court adjudication of actions alleging similar malfeasance by title companies over the last decade. The majority's resolution would set Maryland against the current, as a "clear majority" of courts have generally allowed judicial access to

plaintiffs suing title insurance companies under similar circumstances. *See Campbell v. First Am. Title Ins. Co.*, 644 F.Supp.2d 126, 131 n. 3 & n. 4, 133 (D.Me.2009) (surveying cases and agreeing with the "clear majority" of cases which have not first required administrative pursuit of the claims). *See also White v. Conestoga Title Ins. Co.*, 982 A.2d 997 (Pa.Super.Ct.2009) (allowing class of plaintiffs to bring suit against title insurance companies for failure to give discounted rates without exhausting administrative remedies); *Randleman v. Fid. Nat'l Title Ins. Co.*, 465 F.Supp.2d 812 (N.D.Ohio 2006) (for claims arising out of overcharges of title insurance premiums, court had "exclusive jurisdiction" over claims of breach of contract, fraud, breach of fiduciary duty, conversion, unjust enrichment, and breach of the duty of good faith and fair dealing); *Cf. Hoving v. Lawyers Title Ins. Co.*, 256 F.R.D. 555, 573 (E.D.Mich.2009) (refusing to allow defendant to amend its answer to include an exhaustion defense because of an "apparent lack of merit" of that defense). The majority fails to explain why Maryland should depart from this emerging nationwide consensus.

In sum, both *stare decisis* and the strong logic of Judge Eldridge's analysis in *Zappone*, as well as the trend elsewhere to allow pursuit of these cases in the courts, persuade me that the majority's cursory analysis and contrary conclusion is erroneous.

## II.

Because the majority's rejection of Carter's claim depended not on the sufficiency of his allegations, but on the broader conclusion that his "negligent misrepresentation" claim failed the *Zappone* test of allowing concurrent judicial remedies, I have thus far not addressed the sufficiency of Carter's allegations to state a claim for negligent misrepresentation. This issue, however, is one on which we granted *certiorari* and is sharply contested by Huntington.

To state a claim in negligent misrepresentation, a plaintiff must show that:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement, (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 135–36, 916 A.2d 257, 273 (2007). In this case, the only dispute is whether Carter satisfies the first requirement.

Huntington argues that Carter has not alleged a "false statement," and thus does not state a claim for negligent misrepresentation. In particular, Huntington argues that the allegedly illegal charge listed on the HUD–1 form was merely a statement of actual charges, and, illegal or not, could not have been "false." Huntington draws support from the factually similar *Arthur v. Ticor Title Ins. Co.*, 569 F.3d 154 (4th Cir.2009), in which the Fourth Circuit held, *inter alia,* that a similar statement on a HUD–1 form was not an "affirmative statement" that could support a negligent misrepresentation claim:

> Plaintiffs' complaint alleged only that each HUD–1 form that Ticor gave to plaintiffs contained a false statement because the charge listed on each form for title insurance was unlawfully high. But as the district court correctly held, plaintiffs "admit that the dollar amount listed on the HUD–1 statement under title insurance was the amount charged and collected by Ticor," so plaintiffs "do not [validly] assert that Ticor made any false statements."

*Id.* at 162 n. 3.

This footnote holding in *Arthur* has been recently rejected by the U.S. District Court in the Eastern District of Pennsylvania, in *Levine v. First Am. Title Ins. Co.*, 682 F.Supp.2d 442, 463–64 (E.D.Pa.2010). There, the court considered claims quite similar to those in *Arthur* and in this case: that, "unbeknownst to insurance purchasers, title insurance compa-

nies systematically misrepresented the amount of money due and owing for title insurance by failing to disclose that purchasers who paid an overcharged amount at settlement were entitled to a discounted rate based on the history of the property being insured." *Id.* at 463. The *Levine* court thus confronted the same question considered in *Arthur:* whether the HUD–1 statement is a misrepresentation or simply an accurate statement of the amount paid and, if there was a misrepresentation, whether the defendant was obligated to communicate this error to the plaintiffs. *Id.*

The *Levine* court distinguished its case from *Arthur,* stating that the plaintiff had alleged a scheme to defraud under the mail and wire fraud statutes, whereas *Arthur* had involved no such scheme. *See Levine,* 682 F.Supp.2d at 463 n. 9. The *Levine* court, however, met head-on *Arthur's* distinction between "receipt" statements and other, false statements of legality:

Regardless of how one views the HUD–1, Plaintiffs have alleged facts which raise the inference that the HUD–1 served as a step in the plot to cause pecuniary loss to innocent purchasers of title insurance, and the creation of the HUD–1 was an incidental part of the scheme, even if it merely reflected the amount paid by the purchaser. . . . The information on the HUD–1 would lull title insurance purchasers into believing that the amount listed represents the correct statutory rate when it does not. Although on its face a HUD–1 shows the amount charged and collected by a title insurance company and in this sense may not be a misrepresentation as argued by Defendant, this analysis is far from complete or persuasive when there is an allegation of fraud as advanced here. Plaintiffs claim that the amount shown on the HUD–1 is an overcharge and part of the scheme is to misrepresent to Plaintiffs the correct amount of the premium for title insurance that should have been charged. In this sense, **it is a misrepresentation that the correct premium was charged.** Given the requirement under RESPA that a uniform settlement statement be used at settlement, 12 U.S.C. § 2603, the HUD–1 has the impri-

matur that the figures reflected on it are true and correct. **A purchaser of title insurance, or Plaintiffs in this case, would reasonably assume that the charges listed on the HUD–1 were the charges legally due and owing and not an inflated amount.**

*Id.* at 463–64 (emphasis added). Although the *Levine* decision, read most narrowly, would apply "when there is an allegation of fraud," its conclusion with regard to the nature of the HUD–1 is applicable in any tort claim arising from false statements on the HUD–1 form; those statements are "a misrepresentation that the correct premium was charged." *Id.*

Moreover, given the nature of the relationship between a title insurance company and a real estate purchaser, the title insurance company has a duty to disclose the correct rate, outside of any representation, correct or otherwise, made on the HUD–1 form. "Patently, the duty to furnish the correct information arises when the relationship is of the nature that one party has the right to rely upon the other for information." *Giant Food, Inc. v. Ice King, Inc.,* 74 Md.App. 183, 189, 536 A.2d 1182, 1185 (1988). As the *Levine* Court reasoned:

> [The] Defendant [Title Insurance Company] [o]wed Plaintiffs a [d]uty to [d]isclose ...

> The duty to disclose arises [because] the burden [is] on the title insurer or its agent to conduct a title search on the property, which included an investigation of the existence of prior title insurance, and to issue the insurance rate based on the findings. Placing this burden on the title insurance company without a duty to disclose and charge the correct amount would render the [requirement] meaningless. Defendant has cited no case which stands for the proposition that ... the purchasers of title insurance are presumed to know the correct rates which they are charged.[3]

---

**3.** In *Schwartz,* the Court relied on the regulations of the Title Insurance Rating Bureau of Pennsylvania [TIRBOP], which imposed duties on title insurance companies similar to those imposed by Maryland's regulation scheme.

*Levine v. First Am. Title Ins. Co.,* 682 F.Supp.2d at 464–65. Thus, clearly, the plaintiffs have adequately alleged that Huntington has failed to provide the correct rate of insurance, as it had a duty to do.

This is the only sound conclusion given the dynamics at play during a real estate closing. In the typical real estate transaction, title insurance is presented as a fixed cost, among various other costs, as required by Federal regulation, on the HUD–1 form. The home purchaser or homeowner who refinances his mortgage relies on the settlement attorney or other settlement agent to prepare the HUD–1 form, and accurately notify him what are his settlement costs. Representations on HUD–1 forms are taken seriously and relied on for their accuracy:

> [F]ederal law requires the use of the HUD–1 form at closings, and ... the form is important in the closing, the mortgage process, and the lender's decision.... [T]he form explains the purchase price and the loan amount, as well as all fees and charges, to all parties involved in the transaction. Moreover, under the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C. § 2601 *et seq.,* a HUD–1 form is required at all real estate settlements. It is meant to "conspicuously and clearly itemize all charges imposed upon the borrower and all charges imposed upon the seller in connection with the settlement." 12 U.S.C. § 2603. Because of the stated importance of the disclosures on the HUD–1 form, then, **statements on the form have a "natural tendency to influence"** [the parties to the transaction.]

*United States v. Wilkins,* 308 Fed.Appx. 920, 926–27 (6th Cir.2009). Indeed, the overall gravity of a HUD–1 form is evident in the fact that incorrect statements on a HUD–1 form can support a criminal conviction. *See, e.g., United States v. Gaudin,* 28 F.3d 943 (9th Cir.1994) (false statement on a HUD–1 form may be sufficient to support criminal charges, although it is a question for the jury).

Maryland's regulation of title insurers only further supports the conclusion that an incorrectly charged rate can support the tort claims here. As alleged in Carter's complaint, the Maryland Insurance Code provides that a Title Insurer must file "all rates or premiums, supplementary rate information, forms of contracts, policies, or guarantees of insurance ... that it proposes to use" with the Maryland Insurance Administration. Md.Code Ann., (1997, 2006 Repl.Vol.), § 11–403(a)(1) & (2) of the Insurance Article. Further, as alleged in the complaint, the title agent is prohibited from making or issuing any "contract, policy or guarantee of insurance except in accordance with the filing approved as provided in this subtitle ..." Finally, quoting the Maryland Insurance Commission guidelines, the complaint alleges that the title agent is required to "place a consumer in the most favorable priced tier for which the consumer qualifies."

Given the strict regulation by the Maryland Insurance Administration of what title insurance companies may charge, it is reasonable for a person who comes to a real estate settlement with a title agent to expect that the title agent has correctly stated on the HUD 1 form, the amount that can legitimately be charged for title insurance. Thus, there is a duty for the title agent to accurately disclose the legitimate rates, which is sufficient to comply with the first criteria for a negligent misrepresentation claim. I would, therefore, allow Petitioners' complaint to go forward in Circuit Court.

Chief Judge BELL authorizes me to state that he joins in this dissenting opinion.