J-S37032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAAHIR DAVONNE JOHNS | : | |
| | : | |
| Appellant | : | No. 1199 EDA 2023 |

Appeal from the Judgment of Sentence Entered April 3, 2023
In the Court of Common Pleas of Delaware County
Criminal Division at No(s):  CP-23-CR-0003943-2021

BEFORE:  BOWES, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED MARCH 25, 2025**

Jaahir Davonne Johns ("Johns") appeals from the judgment of sentence following his convictions for first-degree murder and related offenses.[1]  We affirm.

The trial court set forth the following factual and procedural history:

> [I]n . . . September of 2019, Johns and Cwame Moore ("Moore") were housed in the same pod of George W. Hill Correctional Facility in Thornton, Pennsylvania.  After their release, the two became friends on Instagram.  [I]n August [] 2020, Johns posted he was selling a gun on his Instagram.  Moore saw this post and direct messaged Johns, "You gone sell that jawn?" Johns agreed to sell Moore the gun. . . . Johns and Moore exchanged cell phone numbers via direct message on Instagram. Johns texted Moore to meet him at 934 Pennell Street in Chester, Pennsylvania for the transaction.  Moore asked his cousin, Michael McCracken ("McCracken"), for a ride to Chester because McCracken had a license to carry a gun[, and in fact was legally

---

[1] **See** 18 Pa.C.S.A. § 2502(a).  The appeal of Johns's co-defendant Derwin Bradley ("Bradley"), with whom Johns was jointly tried, is before this Court at No. 2374 EDA 2023.

carrying his firearm at the time of this incident]. Additionally, Moore asked Majesty Moreland ("Moreland"), a long-time friend, to come with them. Moreland followed Moore and McCracken in her vehicle to Chester.

After arriving at 934 Pennell Street, they parked and waited for Johns. After approximately ten minutes, Johns drove up in a red vehicle. Johns informed Moore he[, Johns,] needed to get the gun from another individual[,] and drove away. Moore and McCracken, with Moreland following, drove to a nearby Sunoco gas station to wait for Johns. After another ten minutes, Johns called Moore to return to the same location. Moore and McCracken, with Moreland following, drove back to 934 Pennell Street. Moreland parked on the right side of the street, across an intersection, approximately a street away from the initial location. Moore and McCracken parked at the initial location and met Johns on the corner on foot.

Johns told Moore and McCracken they were getting into another vehicle. All three walked around the corner to a silver Acura SUV . . .. Johns got into the front driver's side door of the SUV. Moore got into the driver's side rear seat and McCracken got into the rear passenger seat. Another man, later identified . . . Bradley . . ., was in the front passenger seat with a gun in his lap.

Johns then turned the vehicle around and entered an alleyway between Lloyd and Pennell Street. Johns stopped at the entrance of the alleyway and opened the driver's side door. Then, Johns pulled a gun from his pants and pointed it at Moore. Immediately, McCracken opened the rear passenger door and began to run from the car. Johns stepped out of the open car door, pointed his gun, and fired it multiple times in the direction of McCracken. Moore remained in the driver's side rear seat.

Johns got back into the driver's seat and drove the SUV down the remainder of the alleyway. Johns stopped the car once the vehicle neared 9th Street. Then, Bradley turned and pointed a gun at Moore. Moore emptied the contents of his pockets on the floor of the vehicle[, leaving approximately $2,000]. Johns and Bradley let Moore out of the vehicle. Immediately, Moore ran to where McCracken was laying in the alleyway. McCracken was suffering from multiple gunshot wounds and could no longer stand.

Moore saw McCracken's phone on the ground with 9-1-1 already dialed. Moore called Moreland[,] screaming at her to drive around the corner. Moreland made a right at the intersection where she was parked, and saw McCracken and Moore on the right side of the street. Moreland parked her vehicle close to McCracken and got out of her car. Moore and Moreland attempted to pick up McCracken and place him in her vehicle[,] but[] could not do so. Then, Moreland got on the phone call with the 9-1-1 operator. Moore and Moreland were screaming and frantic when talking to the 9-1-1 operator.

[Later], at approximately 6:00 p.m., Chester police were dispatched to a shooting near Lloyd Street in Chester. Officer Geoffrey Walls ("Officer Walls") was the second officer to arrive on scene. Officer Walls found McCracken, suffering from gunshot wounds in the alley between Lloyd Street and Pennell Street. He observed Moreland and Moore attempting to render aid to McCracken. Emergency services arrived and took McCracken to Crozer-Chester Medical Center in Upland, Pennsylvania. Moreland and Moore left the scene after emergency services departed. Officers began to secure the crime scene and canvas the immediate area. Later that day, . . . McCracken died.

\* \* \* \*

[Johns was charged with, *inter alia*, first-degree murder. Following a jury trial that occurred on January 9 through 13, 2023 and January 17, 2023, the jury convicted Johns of first-degree murder and several related offenses. At trial, Moore made several references in his testimony to first meeting Johns in prison. Additionally, audio recordings from a 911 call after the shooting, containing statements by Moore and Moreland, and audio recorded police statements by Moore and bystander Delores Riley ("Riley")[] were played for the jury. There were no objections to the testimony or audio recordings. Additionally, a ballistics expert testified that the gun McCracken was shot with required a separate pull of the trigger for each shot, and a doctor testified that four shots entered McCracken's back, killing him. Following the verdict, the trial court sentenced Johns in April 2023 to life imprisonment without the possibility of parole for the murder conviction and concurrent sentences for several other convictions not at issue in this appeal.]

On April 12, 2023, Johns filed a timely post-sentence motion. . . . On April 19, 2023, th[e c]ourt entered an order denying [the m]otion.

On May 11, 2023, Johns filed a notice of appeal. . . . [The c]ourt entered an order directing Johns to file a concise statement of matters complained of on appeal. On June 6, 2023, Johns filed a Concise Statement of Matters Complained of on Appeal. On June 20, 2023, Johns's counsel filed, in [the] Superior Court, a petition for leave to withdrawal as counsel. On July 12, 2023, the Superior Court entered an order directing th[e trial c]ourt to appoint new counsel. On July 14, 2023, th[e trial c]ourt granted the motion to withdraw as counsel and appointed new counsel. On August 15, 2023, Johns filed a motion for leave to file a supplemental statement of matters complained of on appeal. On August 15, 2023, th[e c]ourt granted the motion. On September 7, 2023, Johns filed a supplemental concise statement of matters complained of on appeal.

Trial Ct. Op., 10/20/23, at 1-7 (paragraphs re-ordered for clarity; footnotes, citations to the record, and unnecessary capitalization omitted). The trial court likewise complied with Pa.R.A.P. 1925.

Johns raises the following issues for our review:

I. Whether the trial court erred by denying [Johns's] motion for a judgment of acquittal because the Commonwealth had failed to prove beyond a reasonable doubt that [he] had the specific intent to kill.

II. Whether a new trial should be granted where the Commonwealth improperly introduced evidence on direct examination, in its case-in-chief, the audio recorded statements of three witnesses.

III. Whether a new trial should be granted where the Commonwealth improperly introduced evidence on direct examination, in its case-in-chief, of [Johns's] prior imprisonment as no pre-trial application had been filed to admit such evidence.

Johns's Brief at 5.

In his first issue, Johns challenges the sufficiency of the evidence supporting his first-degree murder conviction. Our standard of review for sufficiency issues is as follows:

> Our applicable standard of review is whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict-winner, was sufficient to enable the fact-finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. Additionally, when examining sufficiency issues, we bear in mind that: the Commonwealth's burden may be sustained by means of wholly circumstantial evidence; the entire trial record is evaluated and all evidence received against the defendant considered; and the trier of fact is free to believe all, part, or none of the evidence when evaluating witness credibility.
>
> This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.

*Commonwealth v. Dewald*, 317 A.3d 1020, 1038 (Pa. Super. 2024) (internal citations, quotations, brackets, and indentation omitted).

Murder of the first degree is an intentional killing. *See* 18 Pa.C.S.A. § 2502(a). Our Supreme Court has recently explained that an "intentional killing" is a killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing; and, in order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific intent to kill. *Commonwealth v. Anderson*, 323

A.3d 744, 753 (Pa. 2024). Relevant here, "***[a] jury may infer the specific intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body***." ***Id***. (emphasis added; internal citation omitted). The specific intent to kill can be formed in a "fraction of a second." ***Id***. ***See also Commonwealth v. Rivera***, 773 A.2d 131, 136-37 (concluding the evidence was sufficient to establish deliberation and specific intent to kill where the defendant shot his victim four times, and each shot required a pull of the trigger).

Johns argues the evidence was insufficient to support his first-degree murder conviction because the Commonwealth failed to prove beyond a reasonable doubt that he had specific intent to kill. Johns argues that Riley's testimony suggests there was an exchange of gunfire, and that "the act of firing a gun in the direction of a person several yards away does not establish a specific intent to kill." Johns's Brief at 15-16.[2]

The trial court considered this issue and concluded it was meritless:

> . . . Johns shot McCracken without provocation. The Commonwealth's evidence established McCraken did not return fire with Johns when he was shot. Moore's testimony established McCracken immediately ran from the SUV when Johns pointed a gun at Moore. Moore testified McCracken's gun was still on his hip in the holster when he left the SUV. Additionally, . . . testimony [by Dr. Khalil Wardak ("Dr. Wardak"),] established all

_____

[2] We observe that, for reasons unclear to the Court, Johns refers to Cwame Moore as "Cwame Brown." ***See***, ***e.g.***, Johns's Brief at 6 n.2. While there is no doubt Johns means to refer to Moore, perhaps the confusion is traceable to a mistaken reference by the Commonwealth at trial to Cwame Brown. ***See*** N.T., 1/17/23, at 15.

the bullets entered from McCracken's back. Moore's and Dr. Wardak's testimony were sufficient to allow the jury to find that McCracken was shot in the back.

.Ballistics expert[ Detective] Louis Grandizio ("Grandizio") testified a semi-automatic 9-millimeter gun's trigger needs to be pulled each time a single bullet is fired. Therefore, Grandizio's testimony is sufficient to allow the jury to infer Johns deliberately pulled the trigger before firing each bullet at McCracken.

The evidence allowed the jury to infer Johns' had the conscious purpose to bring about McCracken's death when he pulled the trigger for each of the multiple bullets he fired at the fleeing McCracken. In conclusion, sufficient evidence was presented to support the jury's finding that Johns killed with deliberation.

Trial Ct. Op., 10/20/23, at 14-15 (citations omitted).

Following our review, we conclude the evidence in the light most favorable to the Commonwealth was sufficient to establish beyond a reasonable doubt that Johns had the specific intent to kill McCracken. Specifically, the evidence shows that Johns shot McCracken in the back while McCracken was attempting to flee. *See* N.T., 1/11/23, at 31 (Moore's testimony that Johns shot at McCracken four times as McCracken was fleeing). Each of the four shots Johns fired at McCracken required a separate and deliberate pull of the trigger. *See* N.T., 1/12/23, at 164 (ballistics expert Detective Grandizio explaining that, for a semi-automatic 9 mm firearm, pulling the trigger sends a bullet "down and out that barrel[; and t]hat same energy now is going to extract and eject that cartridge"). Additionally, Johns shot McCracken in his vital organs. *See* N.T., 1/10/23, at 160-64 (Dr. Wardak testifying that McCracken had gunshot wounds to his abdomen, both legs, and

right buttocks, and that the abdomen gunshot went through McCracken's intestines and abdominal aorta, which is a major artery). Thus, the evidence establishes Johns's specific intent to kill McCracken. **See Anderson**, 323 A.3d at 753; **Rivera**, 773 A.2d 131, 136-37. Therefore, this issue merits no relief.

In his second and third issues, Johns argues he is due a new trial because the trial court improperly admitted evidence at trial. Specifically, Johns argues the court admitted during direct examination audio recorded statements of Riley, Moreland, and Moore, which was error because the audio evidence was hearsay, cumulative, and improperly bolstered their testimony. **See** Johns's Brief at 16-22. Johns additionally maintains evidence of Johns's prior incarceration was admitted during: (1) Moore's direct examination, **see id**. at 23; (2) the audio recording of Moore's prior statement, **see id**.; (3) Moore's audio recording played again during the testimony of a detective, **see id**. at 24; and was referred to at three points in the Commonwealth's closing argument, **see id**. at 24-25.

Before we review these assertions of error on the merits, we must determine whether Johns preserved them. **See** Pa.R.A.P. 302(a) (providing that issues cannot be raised for the first time on appeal). **See also Commonwealth v. Houck**, 102 A.3d 443, 451 (Pa. Super. 2014) (noting that a failure to make a timely and specific objection before the trial court at the appropriate stage of the proceedings will result in waiver of the issue).

The trial court reviewed Johns's issues and concluded they were waived. *See* Trial Ct. Op., 10/20/23, at 28 (trial court noting no objection by Johns to Riley's prior statement); *id*. at 32 (trial court noting no objection by Johns to the admission of Moreland's statement); *id*. at 35, 37 (noting no objection by Johns to the admission of Moore's recorded statement); *id*. at 17-25 (concluding that Johns made no objection to the references to his incarceration during Moore's direct examination, the playing of the audio recording of Moore's statement, or references to his incarceration during the Commonwealth's closing).

Our review of the record likewise discloses that Johns did not object to any of the contested evidence at trial. *See* N.T., 1/10/23, at 133-37 *and* N.T., 1/12/23, at 198-200 (no objection by Johns to the audio recording of Riley); N.T., 1/10/23, at 230-32 (no objection by Johns to the audio recording of Moreland); *see also* N.T., 1/11/23, at 67-81 *and* N.T., 1/13/23, at 37-56 (no objection by Johns to the audio recording of Moore's police statement); *see* N.T., 1/11/23, at 10, 69-70 *and* N.T., 1/13/23, at 37-39 (no objection by Johns to the Moore's references to being incarcerated with Johns); N.T., 1/17/23, at 18 (Johns's counsel explaining prior to jury instructions that he had not asked for a cautionary instruction about evidence of Johns's incarceration so as to not "highlight things" for the jury"); *id*. at 132 (no objection by Johns, during or at the conclusion of the Commonwealth's closing, to the Commonwealth's references to his prior incarceration).

Because Johns did not object below, he has waived his second and third issues, and we decline to review them.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/25/2025